# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00703-CV

**Ken Bailey and Bradley Peterson, Appellants**

**v.**

**Carter Smith, Executive Director; Clayton Wolf, Wildlife Division Director;
Mitch Lockwood, Big Game Program Director; and Texas Parks & Wildlife Department,
Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-15-004391, HONORABLE TIM SULAK, JUDGE PRESIDING

## O P I N I O N

This is a dispute between commercial deer breeders and the Texas Parks and Wildlife Department (the Department) over the ownership of captive-bred whitetail deer. Ken Bailey and Bradley Peterson each hold a deer breeder's permit issued by the Department authorizing them "to possess live breeder deer in captivity" and to "engage in the business of breeding breeder deer." *See* Tex. Parks & Wild. Code §§ 43.352(a), .357(a)(1). Peterson and Bailey sued the Department and several of its officials to establish that breeder deer are or became private property and to invalidate Department rules requiring breeders to test for chronic wasting disease. The Department responded that breeder deer are wild animals and therefore "property of the people of this state." *See id.* § 1.011(a). The district court granted the Department's partial plea to the jurisdiction and motion for summary judgment, denied Peterson's cross-motion, and awarded the Department its attorneys' fees. For the reasons that follow, we will affirm.

## LEGAL AND FACTUAL BACKGROUND

The Department is broadly responsible for administering the laws related to wildlife and "for protecting the state's fish and wildlife resources." *See id.* §§ 12.001(a), .0011(a). In addition to granting the Department broad enforcement powers to carry out this task, *see id.* §§ 12.102–.105, the Legislature has authorized the Department to grant certain licenses and permits to assist with managing the state's resources. *See generally id.* §§ 43.021–.955 ("Special Licenses and Permits"). Subchapter L concerns the deer breeder's permit, which authorizes a person to "possess live breeder deer in captivity." *Id.* § 43.352(a); *see generally id.* §§ 43.351–.369 ("Deer Breeder's Permit"). Specifically, the permit authorizes a person to "engage in the business of breeding breeder deer in the immediate locality for which the permit was issued" and to "sell, transfer to another person, or hold in captivity live breeder deer for the purpose of propagation or sale." *Id.* § 43.357(a)(1)–(2). These rights are subject to the Department's authority to adopt rules concerning "the possession of breeder deer" and the "procedures and requirements for the purchase, transfer, sale, or shipment of breeder deer," among other subjects. *See id.* § 43.357(b)(1), (5). Furthermore, moving breeder deer into or out of a facility requires a separate transfer permit issued by the Department.[1] *Id.* § 43.362(b) (providing, with exceptions not relevant here, that "no person may purchase, obtain, sell, transfer, or accept in this state a live breeder deer unless the person

---

[1] A facility is defined in the Department's regulations as "[o]ne or more enclosures, in the aggregate and including additions, that are the site of deer breeding operations under a single deer breeder's permit." 31 Tex. Admin. Code § 65.601(4) (2018) (Tex. Parks & Wild. Dep't, Definitions).

2

obtains a transfer permit"). "Only breeder deer that are in a healthy condition may be . . . transferred." *Id.* § 43.362(a).

One of the more serious health threats to deer is chronic wasting disease (CWD), a progressive neurodegenerative disease that affects cervid species, including deer, elk, reindeer, and moose. *Chronic Wasting Disease*, Centers for Disease Control and Prevention, https://www.cdc.gov/prions/cwd/index.html (last visited June 24, 2019). Symptoms include "drastic weight loss (wasting), stumbling, listlessness and other neurologic symptoms." *Id.* "CWD is fatal to animals and there are no treatments or vaccines." *Id.* To address the risk of CWD, the Department adopted a rule requiring deer breeders to test their herds for CWD as a prerequisite to applying for a transfer permit. *See generally* 31 Tex. Admin. Code § 65.604 (2018) (Tex. Parks and Wild. Dep't, Disease Monitoring).[2] Rule 65.604 prohibits any person from removing deer from a breeder facility that is not "movement qualified" or introducing deer from an unqualified facility without express permission from the Department. *See id.* § 65.604(a)–(c). A facility "is movement qualified if no CWD test results of 'detected' have been returned from an accredited test facility for breeder deer submitted from the facility" and one of three criteria is satisfied:

> (1) the facility is certified by the Texas Animal Health Commission (TAHC) as having a CWD Monitored Herd Status of Level A or higher;
>
> (2) less than five eligible breeder deer mortalities have occurred within the facility as of May 23, 2006; or

---

[2] We cite to the current version of regulations for convenience absent a material and substantial change.

3

> (3) CWD test results of 'not detected' have been returned from an accredited test facility on a minimum of 20% of all eligible breeder deer mortalities occurring within the facility as May 23, 2006.

*Id.* § 65.604(d). A movement-qualified facility loses that status if it does not meet the requirements of Subsection (d) "by March 31 of any year." *Id.* § 65.604(f).

On June 30, 2015, the Department confirmed the first positive test for CWD in Texas captive deer. Subsequent testing found several other infected deer in the same facility. Soon afterwards, the Department's executive director, Carter Smith, promulgated emergency rules significantly increasing the testing necessary to acquire movement-qualified status. *See* 40 Tex. Reg. 5549, 5566–5570 (2015) (emerg. rule 31 Tex. Admin. Code §§ 65.90–.99), *subsequently proposed by* 41 Tex. Reg. 2817, 2853, *adopted by* 41 Tex. Reg. 5631, 5726 (codified as amended at 31 Tex. Admin. Code §§ 65.90–.99). Further, the new rules provided that "no live breeder deer may be transferred anywhere for any reason" except as provided in the new rules. *See* 40 Tex. Reg. at 5568–69. The preface to the emergency rules stated these steps were necessary because up to 30% of Texas deer breeder facilities were potentially exposed to the disease but the manner in which the disease entered that facility was still unknown. *Id.* at 5566. Smith acted in part under his authority to adopt emergency rules to address "an immediate danger to a species authorized to be regulated by the department." Tex. Parks & Wild. Code § 12.027. The order also states the Department is authorized to regulate whitetail deer in captivity as "game animals."

Bailey and Peterson sued the Department seeking declaratory relief invalidating the emergency rules or, in the alternative, certain provisions of the Parks and Wildlife Code. First, they sought a declaration under the Uniform Declaratory Judgment Act (UDJA) that captive-bred deer

4

are private property rather than wild animals. *See* Tex. Civ. Prac. & Rem. Code § 37.004(a) (authorizing a person to "whose rights, status, or other legal relations are affected by a statute" to "obtain a declaration of rights, status, or other legal relations thereunder"). Based on that ownership, they next sought a declaration under the Administrative Procedures Act (APA) that the emergency rules violated procedural due process.[3] *See* Tex. Gov't Code § 2001.038(a) (authorizing declaratory judgment challenging "[t]he validity of applicability of a rule . . . if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff"). As an alternative to the rules challenge, Bailey and Peterson asked the district court to declare (under the UDJA) that various parts of the Parks and Wildlife Code are unconstitutional as applied to them for violating procedural due process. Bailey and Peterson also sued Smith, Big Game Program Director Mitch Lockwood, and Wildlife Division Director Clayton Wolf alleging they acted *ultra vires* by adopting or being involved in the adoption of the emergency rules. Finally, Bailey and Peterson prayed for an award of attorney's fees as allowed by the UDJA. *See* Tex. Civ. Prac. & Rem. Code § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.").

The Department filed an answer and a plea to the jurisdiction asserting sovereign immunity. In its answer, the Department prayed for an award of attorney's fees for defending against the UDJA claims. The Department subsequently adopted permanent rules with essentially the same movement restrictions and heightened testing requirements as the emergency rules. *See*

---

[3] Peterson challenged the rules on several other grounds but has chosen to proceed only on his procedural due process claim in this Court.

5

41 Tex. Reg. 5631, 5726–41. Peterson and Bailey amended their pleadings to challenge the permanent rules (CWD Rules). Bailey then nonsuited his claims.

After various proceedings that do not concern us here, the Department, Smith, Lockwood, and Wolf filed an amended plea to the jurisdiction and motion for summary judgment. The Department asserted the court lacked jurisdiction to decide Peterson's claim for an ownership declaration and that it was entitled to summary judgment on his other two claims because Peterson did not possess an ownership interest in his breeder deer. Peterson filed a cross-motion for summary judgment.

The district court heard arguments, reviewed evidence submitted by the parties, and signed an order providing:

> IT IS ORDERED that [the Department]'s Partial Plea to the Jurisdiction that the Court lacks jurisdiction over Plaintiffs request for a declaration of deer ownership is GRANTED.
>
> IT IS ORDERED that [the Department]'s Partial Plea to the Jurisdiction that the Court lacks jurisdiction over the State Officials with respect to Plaintiffs statutory and constitutional challenges to the rules and the constitutional challenges to the statutes is GRANTED.
>
> . . . .
>
> In addition to and as an alternative, if necessary, to the Court's rulings on [the Department's] Partial Pleas to the Jurisdiction, the Court ORDERS that [the Department's] Motion for Summary Judgment is GRANTED and that Plaintiff's Motion for Summary Judgment is DENIED."
>
> The Court further ORDERS that [the Department]'s Motion for Attorney's Fees is GRANTED. The Court finds and concludes that [the Department]'s defenses of Plaintiffs claims are so inextricably intertwined that segregation of Defendant's attorney's fees is not

6

> required. Therefore, the Court ORDERS that [the Department] recover attorney's fees in the amount of $425,862.50 ($362,967.50 from Plaintiffs Bailey and Peterson jointly and severally, plus $62,895.00 from Plaintiff Peterson, individually). The Court further ORDERS that [Peterson's] Motion for Attorney's Fees is DENIED.

This appeal followed. Peterson appeals the district court's rulings on the plea to the jurisdiction and cross-motions for summary judgment. Bailey and Peterson jointly challenge the fee award.

## JURISDICTION

We first address whether the district court correctly concluded that sovereign immunity barred it from deciding Peterson's claim for a declaration of ownership and his *ultra vires* claims against Smith, Lockwood, and Wolf.

**Standard of Review and Applicable Law**

A plea to the jurisdiction challenges a court's authority over the subject matter of a claim. *City of Ingleside v. City of Corpus Christi*, 469 S.W.3d 589, 590 (Tex. 2015) (per curiam). Whether a court has subject matter jurisdiction is a question of law we review de novo. *Id.* When a plea to the jurisdiction challenges the pleadings, as here, we must determine if the plaintiff carried his burden to plead "facts that affirmatively demonstrate the court's jurisdiction to hear the case." *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 486 (Tex. 2018). In doing so, we construe the pleadings liberally and consider the pleader's intent. *Id.* A plea to the jurisdiction may be granted without affording the plaintiff an opportunity to amend only if the pleadings affirmatively negate the existence of jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004).

Sovereign immunity prohibits "suits against the state unless the state consents and waives its immunity." *Nazari v. State*, 561 S.W.3d 495, 500 (Tex. 2018). Sovereign immunity from suit implicates courts' subject matter jurisdiction "because it recognizes 'the courts' limited authority over the sovereign creating them.'" *Id.* (quoting *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017)).[4] When applicable, sovereign immunity "shield[s] the public from the costs and consequences of improvident actions of their governments." *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006).

Courts address the applicability of immunity through a two-step process. "The judiciary determines the applicability of immunity in the first instance and delineates its boundaries. If immunity is applicable, then the judiciary defers to the legislature to waive such immunity." *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 435 (Tex. 2016) (internal citation omitted). The Legislature may waive immunity by "clear and unambiguous language" in a statute or legislative resolution. *Nazari*, 561 S.W.3d at 500 (quoting Tex. Gov't Code § 311.034).

**Analysis**

Peterson initially asserts the Department's immunity does not apply because it requested attorney's fees. The Texas Supreme Court has held that when a governmental entity "asserts affirmative claims for monetary recovery," immunity does not apply to counterclaims for monetary relief that are "germane to, connected with, and properly defensive to those asserted by the

---

[4] Sovereign immunity "also extend[s] to immunity from liability, but only immunity from suit implicates jurisdiction." *City of Austin v. Utility Assocs.*, 517 S.W.3d 300, 308 n. 18 (Tex. App.—Austin 2017, pet. denied).

governmental entity." *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 376–77 (Tex. 2006). We agree with Peterson that a request for attorney's fees under the UDJA is an affirmative claim, *see Kelsall v. Haisten*, 564 S.W.3d 157, 164 (Tex. App.—Houston [1st Dist.] 2018, no pet.), but a fee request that is "purely defensive in nature" and "unconnected to any claim for monetary relief" does not abrogate immunity under *Reata*. *See Texas Dep't of Criminal Justice v. McBride*, 317 S.W.3d 731, 733 (Tex. 2010). The Department did not file suit in this case and did not seek monetary recovery apart from its request for fees incurred in defending against Peterson's claims, i.e., a "purely defensive" request for fees. As a result, *Reata* does not abrogate its immunity. *See id.*

Having concluded the Department's immunity applies, we now turn to whether Peterson pled a waiver of it for his ownership declaration and his *ultra vires* claims. The UDJA provides that "[a] person whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code § 37.004(a). The Texas Supreme Court has explained the UDJA generally "does not enlarge the trial court's jurisdiction but is 'merely a procedural device for deciding cases already within a court's jurisdiction.'" *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621–22 (Tex. 2011) (per curiam) (quoting *Texas Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011)). The UDJA's sole feature that affects a trial court's subject matter jurisdiction is a limited waiver of sovereign immunity for "claims challenging the validity of ordinances or statutes." *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 633–34 (Tex. 2010) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n.6 (Tex. 2009)). However, the UDJA's waiver of

9

immunity does not apply "when the plaintiff seeks a declaration of his or her rights under a statute or other law." *Sefzik*, 355 S.W.3d at 621.

Peterson contends that the district court necessarily possessed jurisdiction to render his ownership declaration because his remaining claims turn on that very issue. We agree that Peterson's ownership interest in his breeder deer is relevant to those claims and decide that issue below, but that overlap does not mean the district court necessarily possessed jurisdiction over *this* claim. *See Heckman v. Williamson County*, 369 S.W.3d 137, 152–53 (Tex. 2012) (stating rule that plaintiff "must demonstrate that the court has jurisdiction over . . . each of his claims" and that "the court must dismiss those claims (and only those claims) over which it lacks jurisdiction"). Peterson goes on to ask us to recognize a waiver of immunity by analogy to the Texas Constitution's open courts guarantee, which states: "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Tex. Const. art. I, § 13. This provision guarantees that the legislature may not abolish a well-established common law cause of action for injuries done to one's "lands, goods, person or reputation" without providing a "reasonable substitute." *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 143 (Tex. 2018). Peterson argues "[i]t makes no sense" for Texas courts to have jurisdiction to decide whether the Legislature has unreasonably abridged the right to recover for damages to "goods"—i.e., property—but have no power to decide whether property rights exist in the first instance. But Peterson does not allege a due-course-of-law claim. He seeks a freestanding declaration of his statutory rights, and the Texas Supreme Court has been clear that state agencies are immune from

10

such claims absent a specific waiver.[5] *See Sefzik*, 355 S.W.3d at 621; *Sawyer Tr.*, 354 S.W.3d at 388

(holding "no general right to sue a state agency for a declaration of rights" under UDJA exists).

Having identified none, we conclude the district court lacked jurisdiction over Peterson's claim for

an ownership declaration. *See McLane Co. v. Tex. Alcoholic Beverage Comm'n*, 514 S.W.3d 871,

876 (Tex. App.—Austin 2017, pet. denied) ("[The Texas Supreme Court] has squarely repudiated

the once-widespread notion that the UDJA confers some broader right to sue government to obtain

'statutory construction' or a 'declaration of rights.'" (quoting *Ex parte Springsteen*, 506 S.W.3d 789,

799 (Tex. App.—Austin 2016, pet. denied))).

Peterson also asserted claims against Smith, Lockwood, and Wolf in their official

capacities.[6] Sovereign immunity from suit generally extends to state officials acting in their official

capacities because "a suit against a government official acting in an official capacity is 'merely

another way of pleading an action against the entity of which the official is an agent.'" *Brown & Gay*

*Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 120 (Tex. 2015) (quoting *Texas Adjutant Gen.'s Office*

---

[5] Peterson also cites to *McIntyre v. El Paso Independent School District*, 499 S.W.3d 820, 821 (Tex. 2016) and *Texas Education Agency v. Leeper*, 893 S.W.2d 432 (Tex. 1994), but neither supports his argument. *McIntyre* involved whether two parents challenging compulsory school attendance laws were required to exhaust administrative remedies before bringing suit. 499 S.W.3d at 821. *Leeper* concerned whether the court of appeals correctly concluded a law was penal, thus depriving the trial court of jurisdiction to construe it. 893 S.W.2d at 441. Neither case involved the kind of freestanding declaration of rights Peterson seeks here.

[6] Peterson also sued Smith, Lockwood, and Wolf in their personal capacities. He later nonsuited his personal-capacity claims against Smith and does not mention his personal-capacity claims against Lockwood and Wolf in his brief to this Court. A brief must contain "a clear and concise argument for the contentions made," supported by "appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(i). Failure to provide argument and analysis in support of an issue can result in waiver. *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 126 (Tex. 2018). We conclude Peterson waived his personal-capacity claims against Lockwood and Wolf.

11

*v. Ngakoue*, 408 S.W.3d 350, 356 (Tex. 2013)). However, a suit against a state official can go forward if the official "acted *ultra vires*, or without legal authority, in carrying out his duties." *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 157–58 (Tex. 2016). A proper *ultra vires* suit "must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* at 161 (quoting *Heinrich*, 284 S.W.3d at 372).

Peterson alleged that Smith, Lockwood, and Wolf acted *ultra vires* because the CWD Rules do not require the Department to inspect breeder deer for disease before denying a transfer permit, a requirement Peterson finds in Section 43.3591 of the Parks and Wildlife Code. *See* Tex. Parks & Wild. Code § 43.3591 ("Genetic Testing"). We do not reach the merits of that argument (or consider whether it conflicts with his assertion under his other claims that the Parks and Wildlife Code does *not* provide a hearing), because Smith, Lockwood, and Wolf are not proper parties to this claim. An *ultra vires* suit must be brought "against the 'allegedly responsible government actor in his official capacity.'" *Hall*, 508 S.W.3d at 240 (quoting *Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 76 (Tex. 2015)). Smith acted under his authority as Executive Director in adopting the emergency rules, but the Department adopted the current CWD Rules of which Peterson complains under its statutory authority to regulate the possession, purchase, transfer, and sale of breeder deer. *See* 41 Tex. Reg. 5631, 5757 (citing Tex. Parks & Wild. Code § 43.357(b)(1), (5)). Because Smith, Lockwood, and Wolf did not adopt the CWD Rules that regulate Peterson's breeder deer, the district court correctly concluded it lacked jurisdiction over

these claims. *See Hall*, 508 S.W.3d at 240 (concluding chancellor of University of Texas not proper party to *ultra vires* suit challenging rules adopted by board of regents).

We have concluded that the district court lacked jurisdiction over Peterson's requested ownership declaration and that Smith, Lockwood, and Wolf are not proper parties to Peterson's *ultra vires* claims. Because these pleading defects affirmatively negate the existence of jurisdiction, Peterson is not entitled to an opportunity to amend. *See Miranda*, 133 S.W.3d at 227.

## SUMMARY JUDGMENT

We next consider whether the district court erred by granting the Department's motion for summary judgment on Peterson's due process claims and denying Peterson's cross-motion.[7]

**Standard of Review**

We review a court's ruling on a motion for summary judgment de novo. *Texas Workforce Comm'n v. Wichita County*, 548 S.W.3d 489, 492 (Tex. 2018). Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a

---

[7] Peterson initially contends we should not review the district court's ruling because it is an improper advisory opinion. "The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties." *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). The Department did not contest the district court's jurisdiction over Peterson's rules challenge or his alternative constitutional challenge, so those claims were properly before the court for decision. *See Masterson v. Diocese of Nw. Tex*, 422 S.W.3d 594, 601 (Tex. 2013) ("Texas courts are bound by the Texas Constitution to decide disputes over which they have jurisdiction."). We need not decide whether the district court's conditional ruling on Peterson's ownership declaration was advisory because we have sustained the Department's plea to the jurisdiction on that issue. *See* Tex. R. App. P. 47.1 (directing appellate courts to hand down an opinion "as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").

matter of law. Tex. R. Civ. P. 166a(c). "On cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law." *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 259 (Tex. 2018). When, as here, the trial court grants one motion and denies the other, we "must determine all questions presented and render the judgment that the trial court should have rendered." *Id.*

Resolving Peterson's issues will require us to construe the Parks and Wildlife Code. Statutory construction presents a question of law that we review de novo. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018). Our goal when construing a statute is to determine and give effect to the legislature's intent. *Id.* We rely on the plain meaning of the statutory text as expressing legislative intent. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). When analyzing a specific provision, we "consider the context and framework of the entire statute and meld its words into a cohesive reflection of legislative intent." *Id.* at 839 (quoting *Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017)). "Further, we construe statutory language against the backdrop of common law, assuming the Legislature is familiar with common-law traditions and principles." *Marino v. Lenoir*, 526 S.W.3d 403, 409 (Tex. 2017). We also may consider "former statutory provisions, including laws on the same or similar subjects" and the "consequences of a particular construction." Tex. Gov't Code § 311.023(4), (5).

**Procedural Due Process**

The Texas Constitution provides that no person "shall be deprived of life, liberty, property, privileges or immunities . . . except by the due course of the law of the land." Tex. Const. art. I, § 19. Because the due course of law guarantee and the federal due process clause

14

are textually similar, the Texas Supreme Court has "traditionally followed contemporary federal due process interpretations of procedural due process issues." *Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018) (quoting *University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)). A two-part test governs a procedural due process claim: a court must determine whether the petitioner possesses "a liberty or property interest that is entitled to procedural due process protection" and, if so, "what process is due." *Mosley v. Texas Health & Human Servs. Comm'n*, ___ S.W.3d ___, ___, No. 17-0345, 2019 WL 1977062, at *9 (Tex. May 3, 2019) (quoting *Than*, 901 S.W.2d at 929).

"Property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Honors Acad.*, 555 S.W.3d at 61 (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Only vested rights are constitutionally protected. *Id.* "To have a constitutionally protected property interest, a person must have a 'legitimate claim of entitlement' rather than a mere 'unilateral expectation.'" *Id.* (quoting *Roth*, 408 U.S. at 577). Put another way, a constitutionally protected interest is "something more than a mere expectancy based upon an anticipated continuance of an existing law." *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 15 (Tex. 2015) (quoting *City of Dallas v. Trammell*, 101 S.W.2d 1009, 1014 (Tex. 1937)).

The Texas Supreme Court has described "the right to own private property as 'fundamental, natural, inherent, inalienable, not derived from the legislature and as preexisting even constitutions.'" *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 535 (Tex. 2013) (quoting *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977)). Property, in legal terms,

"does not refer to a thing but rather to the rights between a person and a thing." *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 382–83 (Tex. 2012). "The designation of an object as tangible property means that it has acquired sufficient rights to be recognized as property under the law." *Id.* at 383 (citing Michael A. Heller, *The Tragedy of the Anticommons: Property in the Transition from Marx to Markets*, 111 Harv. L. Rev. 621, 666–67 (1998)). Some of the key components of the bundle of property rights "include the rights to possess, use, transfer and exclude others." *Id.* (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979); *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945)).

Historically, whether property rights could arise in an animal depended on the animal's common law classification. "The common law divides animals into two groups: animals *domitae naturae* or *mansuetae naturae*—that is, tame or tamed, domestic animals—and animals *ferae naturae*—that is, wild, usually found at liberty." *Union Pac. R.R. v. Nami*, 498 S.W.3d 890, 896 (Tex. 2016). The common law of England "based property in [wild animals] upon the principle of common ownership." *Geer v. Connecticut*, 161 U.S. 519, 526 (1896), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979). Private individuals could "reduce a part of this common property to possession, and thus acquire a qualified ownership in it," but that right was subject to government regulation. *Id.* (citation omitted). The American states inherited this power with the understanding that it was "to be exercised, like all other powers of government, as a trust for the benefit of the people." *Id.* at 529. In this conception:

> The wild game within a state belongs to the people in their collective
> sovereign capacity. It is not the subject of private ownership, except
> in so far as the people may elect to make it so; and they may, if they

16

see fit, absolutely prohibit the taking of it, or traffic and commerce in it, if it is deemed necessary for the protection or preservation of the public good.

*Id.* (quoting *Ex parte Maier*, 37 P. 402, 404 (Cal. 1894)). Texas adopted the common law of England as its rule of decision in 1840. *See* Act approved Jan. 20, 1840, 4th Cong., R.S., 1839 Repub. Tex. Laws 3, *reprinted in* 2 H.P.N. Gammal, *The Laws of Texas*, *1822–1897*, at 177–78 (Austin, Gammal Book Co., 1898) (now codified at Tex. Civ. Prac. & Rem. Code § 5.001). Texas courts have consistently treated the public trust doctrine as forming part of the common law since that time. *See, e.g.*, *State v. Marshall*, 13 Tex. 55, 57 (1854) (applying rule that wild animals are generally not "the subject of property"); *Ex parte Blardone*, 115 S.W. 838, 840 (Tex. Crim. App. 1909) ("The authorities are uniform in holding that the absolute ownership of wild game is vested in the people of the state and that such is not the subject of private ownership." (citation omitted)); *Coastal Habitat All. v. Public Util. Comm'n*, 294 S.W.3d 276, 287 (Tex. App.—Austin 2009, no pet.) (explaining that "wild animals[] belong to the State, and no individual property rights exist in them as long as they remain wild, unconfined, and undomesticated"); *Hollywood Park Humane Soc. v. Town of Hollywood Park*, 261 S.W.3d 135, 140 (Tex. App.—San Antonio 2008, no pet.) (explaining that no property rights exist in wild animals "as long as the animal remains wild, unconfined, and undomesticated," but property rights "can arise when an animal is legally removed from its 'natural liberty' and subjected to 'man's dominion'" (quoting *State v. Bartee*, 894 S.W.2d 34, 41 (Tex. App.—San Antonio 1994, no pet.) and citing *Nicholson v. Smith*, 986 S.W.2d 54, 60 (Tex. App.—San Antonio 1999, no pet.))). The Texas Legislature essentially codified this doctrine in 1907 by enacting a statute providing that "[a]ll the wild deer" as well as several other types of

17

animals "found within the borders of this State, shall be and the same are hereby declared to be the property of the public." Act of April 19, 1907, 30th Leg., R.S., ch. 144, § 1, 1907 Tex. Gen. Laws 278, 278 (current version at Tex. Parks & Wild. Code § 1.011(a)).**8** Each subsequent version of the statute designated wild animals as either "property of the people of this state" or "property of the public." *Bartee*, 894 S.W.2d at 42 & n.10. The current version provides: "All wild animals, fur-bearing animals, wild birds, and wild fowl inside the borders of this state are the property of the people of this state." Tex. Parks & Wild. Code § 1.011(a).

Peterson argues that we should not interpret Section 1.011 as codifying the public trust doctrine because the United States Supreme Court allegedly rejected that doctrine as a "19th-century legal fiction" when it overruled *Geer. See Hughes*, 441 U.S. at 335–36. But Peterson ignores that both *Geer* and *Hughes* concerned challenges to state statutes under the Commerce Clause of the United States Constitution rather than to the public trust doctrine generally. *See* U.S. Const. art. I, § 8, cl. 3.**9** Geer had been convicted under a Connecticut statute banning export of game animals from the state and challenged the law as burdening interstate commerce. *Geer*, 161 U.S. at 521. The Court upheld the ban on the ground that "[t]he common ownership [of wild animals] imports the right to keep the property, if the sovereign so chooses, always within its

---

**8** The people of Texas subsequently amended the Constitution to state: "The conservation and development of all of the natural resources of this State . . . are each and all hereby declared public rights and duties." Tex. Const. art. XVI, § 59. The Department asserts wild game animals such as whitetail deer are part of the "natural resources" Section 59 was intended to empower the Legislature to conserve. We do not reach this issue because it is unnecessary in light of our resolution of Peterson's due process claim below. *See* Tex. R. App. P. 47.1.

**9** The Commerce Clause grants Congress authority to regulate interstate commerce but "also limits the power of states to interfere with interstate commerce." *ETC Mktg., Ltd. v. Harris Cty. Appraisal Dist.*, 528 S.W.3d 70, 75–76 (Tex. 2017), *cert. denied*, 138 S.Ct. 557 (2017).

18

jurisdiction for every purpose." *Id.* at 530. In *Hughes*, the Court overruled *Geer* and held it would

evaluate state regulations of wildlife under the Commerce Clause "according to the same general rule

applied to state regulations of other natural resources." 441 U.S. at 335. However, the Court

stressed that "[t]he overruling of *Geer* does not leave the States powerless to protect and conserve

wild animal life within their borders." *Id.* at 338. In the years following, state courts have held

*Hughes* did not invalidate their own public trust statutes or constitutional provisions. *See, e.g.*,

*People v. Rinehart*, 377 P.3d 818, 823 & n.3 (Cal. 2016); *Pullen v. Ulmer*, 923 P.2d 54, 60 (Alaska

1996); *State v. Fertterer*, 841 P.2d 467, 470–71 (Mont. 1992), *overruled on other grounds*, *State

v. Gatts*, 928 P.2d 114 (Mont. 1996). Persuaded by these decisions, we conclude *Hughes* does

not affect the continued validity of the public trust doctrine. *See PPL Mont., LLC v. Montana*,

565 U.S. 576, 603–04 (2012) (remarking "the public trust doctrine remains a matter of state law"

and is not defined by the Constitution).

Under the public trust doctrine an animal must be "legally removed" from the wild

before property rights can arise in it.[10] *See Bartee*, 894 S.W.2d at 41 ("A wrongful reducing to

possession of creature *ferae naturæ* cannot form the basis of ownership." (quoting 3A C.J.S.

Animals, § 8 (1973))). The Legislature has enacted statutes defining whitetail deer as "game

animals" and providing that "[n]o person may capture, transport, or transplant any game animal or

---

[10] The Parks and Wildlife Code now provides that "'[w]ild,' when used in reference to an animal, means a species, including each individual of a species, that normally lives in a state of nature and is not ordinarily domesticated." Tex. Parks & Wild. Code § 1.101(4). The Department asserts that this definition essentially abolishes the common law rule by making an animal's status depend on its species rather than its individual circumstances. We do not address this argument because our narrower analysis below is sufficient to dispose of Peterson's appeal. *See* Tex. R. App. P. 47.1.

19

game bird from the wild in this state" without a permit from the Department. *See* Tex. Parks & Wild. Code § 43.061(a); *see also id.* § 63.001(a) (defining whitetail deer as game animals). Another statute more generally provides that "[n]o person may possess a live game animal in this state for any purpose not authorized by this code." *Id.* § 63.002. In addition, restriction of the movements of animals by fences (i.e., removing them from their "natural liberty") does not affect their status as "property of the people of this state." *Id.* § 1.013. Read together, these provisions prohibit a person from removing whitetail deer from the wild and holding them in captivity without a permit from the Department.

Peterson maintains that his breeder's permit either allows for ownership rights to arise in breeder deer according to the common law or actually conveys ownership of breeder deer.[11] While a breeder's permit authorizes a person "sell, transfer to another person, or hold in captivity live breeder deer for the purpose of propagation or sale," *id*. § 43.357(a), the permit statute expressly

---

[11] Peterson asks us to apply *Wiley v. Baker*, 597 S.W.2d 3 (Tex. App.—Tyler 1980, no writ), and hold that common law property rules prevail over the definition of whitetail deer as a game animal. *Wiley* concerned an elk that had escaped from a game farm run by Wiley and later killed by Baker. *Id.* at 4. The court of appeals held the statutory definition of elk as a game animal applied only to hunting laws and therefore did not control the animal's status because there had been no violation of those laws. *Id.* at 5–6. The parties in *Wiley* did not address Section 43.061's prohibition on capturing or transporting game animals from the wild, likely because the version in effect at the time exempted game animals "privately raised or privately owned." Act of May 31, 1975, 64th Leg., R.S., ch. 545, §1, 1975 Tex. Gen Laws 1405, 1488 (current version codified at Tex. Parks & Wild. Code § 43.061). The Legislature later repealed that exception while leaving the broader prohibition unchanged. *See* Act of May 25, 1995, 74th Leg., R.S., ch. 927, § 7, sec. 43.061, 1995 Tex. Gen Laws 4650, 4652. *Wiley* also predates the Legislature's enactment of Sections 1.013 and 6.002. *See* Act of May 31, 1997, 75th Leg., R.S., ch. 1256, § 123, 1997 Tex. Gen. Laws 4732, 4757 (current version at Tex. Parks & Wild. Code § 1.013); Act of May 31, 1997, 75th Leg., R.S., ch. 1256, § 96, 1997 Tex. Gen. Laws 4732, 4751 (current version at Tex. Parks & Wild. Code § 63.002). The legal landscape has sufficiently changed since *Wiley* was decided that we do not find it persuasive here.

defines "breeder deer" as white-tailed or mule deer "*legally held under a permit authorized by this subchapter*," *id.* § 43.351(1) (emphasis added). Nothing in subchapter L makes breeder deer property of the deer breeder. *See generally id.* §§ 43.351–.369. Peterson nevertheless maintains that Sections 43.364 and .366 allow for property rights to arise in breeder deer according to common law principles. Section 43.364 states:

> Breeder deer may be purchased, sold, transferred, or received in this state only for the purposes of liberation or holding for propagation. All breeder deer and increase from breeder deer are under the full force of the laws of this state pertaining to deer, and those breeder deer may be held in captivity for propagation in this state only after a deer breeder's permit is issued by the department under this subchapter.

*Id.* § 43.364. Peterson contends that "the laws of this state" include the common law rule. We agree that the laws of this state include the common law, but we must construe the statutory language in context. *See Rodriguez*, 547 S.W.3d at 838. Section 43.364 sets out the two permissible purposes for which a person may use breeder deer and specifies that they may be held in captivity only pursuant to a permit issued by the Department. Read in that context, we interpret the statutory command that "[a]ll breeder deer and increase from breeder deer are under the full force of the laws of this state pertaining to deer" to mean that the law pertaining to wild animals—including their status as public property—applies to breeder deer except to the extent that a breeder's permit authorizes a limited departure from those laws. *See* Tex. Parks & Wild. Code § 43.364. Section 43.366 makes the same point more explicitly: "breeder deer held under a deer breeder's permit are subject to all laws and regulations of this state pertaining to deer *except as specifically provided in*

21

*this subchapter.*"  *Id.* § 43.366 (emphasis added).  Neither section allows common law property

rights to arise in breeder deer.  *See id.* §§ 43.364, .366.

Moreover, allowing private property rights to arise in breeder deer is incompatible

with the Legislature's direction that breeder deer are "held under a permit."  *See id.* § 43.351(1).  The

Legislature has specifically provided that a breeder's permit is valid for only a set amount of time,

*see id.* § 43.352(b), and nothing in the statute contemplates that the breeder retain any rights over

breeder deer after the permit expires or is revoked by the Department, *see generally id.*

§§ 43.351–.369; *see also id.* § 43.365 (providing that a person commits an offense who "knowingly

sells, arranges the sale of, purchases, transfers, receives, or attempts to sell, arrange the sale of,

purchase, transfer, or receive a live breeder deer in violation of this subchapter").[12]  But if breeder

deer become private property, the owner's rights would not depend on the status of the permit

because private property rights are "not derived from the legislature."  *See Kopplow Dev.*,

399 S.W.3d at 535 (quoting *Eggemeyer*, 554 S.W.2d at 140).  The statutory scheme simply leaves

no room for common law property rights to arise in breeder deer.

Construing all these provisions together against the backdrop of Section 1.011 and

the common law, *see Marino*, 526 S.W.3d at 409, we conclude breeder deer are public property held

under a permit issued by the Department and, consequently, deer breeders do not acquire common

---

[12] Subchapter L does not address disposition of breeder deer after the permit term expires. However, Department regulations require the deer breeder to sell, transfer, or donate the breeder deer to a person who holds a permit allowing possession of them or to obtain authorization to release the breeder deer into the wild.  *See* 31 Tex. Admin. Code § 65.612(b) (2019) (Tex. Parks & Wild. Dep't, Disposition of Deer).

law property rights in them.[13] *See Anderton v. Texas Parks & Wildlife Dep't,* 605 F. App'x 339, 348 (5th Cir. 2015) (per curiam) ("While a permittee may have possession of the breeder deer, the deer are only 'held under a permit[.]'  Nowhere do the statutes or regulations state that breeder deer become the property of a permit holder." (internal citation omitted)); *In re Wheeler*, 431 B.R. 158, 160 (Bankr. N.D. Tex. 2005) (construing Texas law and holding that debtor, a deer breeder, "does not have title to the deer.  The deer are considered wild animals, and are property of the people of the State of Texas.").

That breeder deer are not common law property does not mean that breeder deer have no legal status or protection under the law.  Our holding does not affect the rights conferred by a deer breeder's permit or whether those rights are enforceable against third persons.  *See, e.g.*, *Bartee*, 894 S.W.2d at 43 & nn.13–14 (concluding that deer held under a previous version of breeder's permit were protected by theft and criminal mischief laws).  The rights of hunters who lawfully kill deer are also unaffected.  *See generally* Tex. Parks & Wild. Code §§ 62.021–.032 ("Sale, Transportation, and Storage of Game").  Peterson nevertheless insists that our construction will destabilize the deer industry by removing any economic incentive to engage in deer breeding, a major component of Texas' hunting industry.  On the other hand, various *amici* with ties to the hunting

---

[13] Even though several recent court decisions articulate the government's authority over wild animals in terms of ownership, *e.g.*, *Coastal Habitat All. v. Public Util. Comm'n*, 294 S.W.3d 276, 287 (Tex. App.—Austin 2009, no pet.) (stating that wild animals "belong to the State"), our conclusion does not mean the Department owns breeder deer.  Like other wild animals, breeder deer " belong[] to the people in their collective sovereign capacity." *Geer v. Connecticut*, 161 U.S. 519, 526 (1896), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979) (quoting *Ex parte Maier*, 37 P. 402, 404 (Cal. 1894)).  The state's authority over such animals is "not based on ownership, but upon the state's police power to preserve and regulate an important resource."  *State v. Bartee*, 894 S.W.2d 34, 47 (Tex. App.—San Antonio 1994, no pet.) (Rickhoff, J., concurring).

industry urge that the public trust doctrine is vital to the continuing health of the hunting and deer breeding industries.[14] We do not address these arguments because "[t]he wisdom or expediency of the law is the Legislature's prerogative, not ours." *City of Laredo v. Laredo Merchants Ass'n*, 550 S.W.3d 586, 589 (Tex. 2018) (quoting *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968)). Subchapter L is clear that deer breeders have no vested property interest in their breeder deer, and we must enforce the statute as written.

Our conclusion does not address whether a breeder has a vested right in a breeder's permit. *See Anderton*, 605 F. App'x at 346–48 (analyzing property interest in breeder's permit separately from interest in deer herd). Peterson asserts in his briefing that "regardless of the captive-bred deer ownership issue" the Department must further show that he has no protected property interest in his breeder's permit. Specifically, he asserts that "the pursuit of one's chosen, lawful occupation" is a protected interest and, as a result, his permit "cannot be taken without procedural due process."[15] The right to pursue a certain occupation is an economic liberty interest protected by the substantive component of the due course of law clause. *See Mosley*, 2019 WL 1977062, at *9 ("Included among the protected liberty interests is the right 'to engage in

---

[14] This Court has received an amicus brief from the Texas Wildlife Association, the Boone and Crockett Club, Texas Chapter of the Wildlife Society, the Association of Fish and Wildlife Agencies, the National Wildlife Federation, the National Wild Turkey Federation, Texas Chapter of the Coastal Conservation Association, the Backcountry Hunters & Anglers, and the Texas and Southwestern Cattle Raisers Association in support of the Department's position.

[15] Peterson cites to *House of Tobacco, Inc. v. Calvert*, where the Texas Supreme Court held that the Comptroller of Public Accounts could not revoke a permit to distribute cigarettes without providing notice and a hearing. 394 S.W.2d 654, 657–58 (Tex. 1965). *Calvert* is not applicable here because there is no suggestion that the Department has revoked or intends to revoke Peterson's breeder's permit.

any of the common occupations of life.'" (quoting *Than*, 901 S.W.2d at 929)). To establish that an economic regulation is unconstitutional for violating this protection, a party must show either that the law's "purpose could not arguably be rationally related to a legitimate governmental interest" or that "when considered as a whole, the [law's] actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest." *Patel*, 469 S.W.3d at 87. Peterson alleged in a previous petition that the CWD Rules are unconstitutionally oppressive but his live petition at the time of the district court's ruling omits that claim. *See FKM P'ship, Ltd. v. Board of Regents of Univ. of Hous. Sys.*, 255 S.W.3d 619, 632 (Tex. 2008) (filing amended petition omitting claim "effectively nonsuits or voluntarily dismisses the omitted claims as of the time the pleading is filed"). Because Peterson elected not to go forward on that claim in the district court, we decline to address it here.[16]

### ATTORNEY'S FEES

Peterson and Bailey challenge the district court's award of $425,862.50 in attorney's fees in their remaining issues. "In any proceeding under [the UDJA], the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code § 37.009. The UDJA "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). "A trial court abuses its discretion by awarding fees

---

[16] We stress that we express no opinion on whether Peterson has a vested right under the terms of his permit.

25

when there is insufficient evidence that the fees were reasonable and necessary, or when the award is inequitable or unjust." *Save Our Springs All., Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 891 (Tex. App.—Austin 2010, pet. denied).

**Jurisdiction to Award Fees**

Peterson initially challenges whether the district court had jurisdiction to award fees if it lacked jurisdiction to decide the merits of one of Peterson's claims. This Court has held that courts possess authority to awards fees in that circumstance because the UDJA authorizes courts to award fees "[i]n any proceeding under the UDJA." *Id.*; *accord Devon Energy Prod. Co., v. KCS Res., LLC*, 450 S.W.3d 203, 220 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *Feldman v. KPMG LLP*, 438 S.W.3d 678, 685–86 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Castro v. McNabb*, 319 S.W.3d 721, 735–36 (Tex. App.—El Paso 2009, no pet.). Peterson asserts these holdings conflict with cases holding an award of fees under the UDJA is unavailable when a party's claim was incidental to its other claims for relief. *E.g.*, *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 301 (Tex. 2011). But *Jackson* and related cases are based on the principle that a party may not replead a claim under the UDJA to circumvent limits on attorney's fees. *Id.*; *see MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009). That principle does not preclude an award of fees for defending against another party's claim for declaratory relief. We conclude the district court possessed jurisdiction to award fees for both of Peterson's UDJA claims. *See Save Our Springs All.*, 304 S.W.3d at 891; *see also Zurita v. SVH-1 Partners, Ltd.*, No. 03-10-00650-CV, 2011 WL 6118573, at *8 (Tex. App.—Austin Dec. 8, 2011, pet. denied)

(mem. op.) ("The trial court's conclusion that it lacked jurisdiction to render the requested declarations did not change the nature of the proceeding.").

**Jurisdiction over Bailey**

Next, Bailey argues the district court lost jurisdiction over him following his nonsuit. A plaintiff has an absolute right to take a nonsuit at any time before introducing all of his evidence other than rebuttal evidence. Tex. R. Civ. P. 162. However, a dismissal "shall not prejudice the right of an adverse party to be heard on a pending claim for affirmative relief." *Id.* More specifically, a nonsuit has "no effect on any motion for . . . attorney's fees or other costs, pending at the time of dismissal." *Id.* Bailey does not dispute the Department requested attorney's fees under Section 37.009 in its original answer and that this request was pending at the time of his nonsuit. The district court therefore had power to decide the entirety of the Department's pending claim for attorney's fees. *See Villafani v. Trejo*, 251 S.W.3d 466, 469 (Tex. 2008) ("[A] plaintiff's nonsuit cannot extinguish a defendant's counterclaim for costs and attorney's fees.").

**Segregation**

Bailey and Peterson next challenge the district court's refusal to require the Department to segregate its fees. Texas follows the American Rule for attorney's fees, which provides that "a party may not recover attorney's fees unless authorized by statute or contract." *Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 915 (Tex. 2015). As a result, fee claimants must "segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). An exception exists

27

when fees are based on claims arising out of the same transaction that are so intertwined and inseparable as to make segregation impossible. *Id.* at 313–14. However, "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* Whether and the extent to which segregation is required is a mixed question of law and fact. *See id.* at 313; *Osborne v. Jauregui, Inc.*, 252 S.W.3d 70, 76 (Tex. App.—Austin 2008, pet. denied). The burden is on the party seeking fees to show segregation is not required. *Home Comfortable Supplies, Inc. v. Cooper*, 544 S.W.3d 899, 911 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Peterson and Bailey asserted claims under the UDJA and the APA. Unlike the UDJA, the APA does not authorize a court to award attorney's fees. *See Texas State Bd. of Veterinary Med. Exam'rs v. Giggleman*, 408 S.W.3d 696, 708 (Tex. App.—Austin 2013, no pet.). The Department argues segregating its fees is impossible because both claims turned on whether breeder deer are private property. Peterson and Bailey respond the APA and UDJA claims are distinct because the CWD Rules "do not even purport to address the issue of ownership." They also point out they originally asserted a substantive due process claim. Peterson and Bailey insist the Department has not even attempted to meet its burden, but the Department in fact segregated the fees it incurred responding to Peterson's previously nonsuited claims under the Texas Open Meetings Act. We agree with the Department that further segregation is not required because Peterson and Bailey's various due process claims all depended on the existence of a property interest entitled to constitutional protection. *See, e.g.*, *Klumb*, 458 S.W.3d at 15 ("Before any substantive or procedural due-process rights attach, however, the Petitioners must have a liberty or property interest that is

28

entitled to constitutional protection."). Under these circumstances, we conclude the Department carried its burden to show segregation was unnecessary. *See Chapa*, 212 S.W.3d at 313–14.

**Reasonable and Necessary**

We now turn to whether the fee award was reasonable and necessary. Whether fees are reasonable and necessary is an issue of fact. *Bocquet*, 972 S.W.2d at 21. To find an abuse of discretion "when factual matters are in dispute, the reviewing court must conclude that the facts and circumstances of the case extinguish any choice in the matter." *In re Mahindra, USA Inc.*, 549 S.W.3d 541, 550 (Tex. 2018) (orig. proceeding). Peterson and Bailey assert the Department failed to provide legally sufficient evidence that its fees were reasonable and necessary. *See In re National Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding) ("When fee-shifting is authorized, the party seeking to recover those fees bears the burden of establishing the fees are reasonable and necessary.").

To support its fee claim the Department submitted a sworn affidavit executed by Philip Ledbetter, an assistant attorney general experienced in natural resource litigation. Ledbetter employed the lodestar method, which involves multiplying the reasonable hours worked by a reasonable hourly rate. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). The Texas Supreme Court recently explained that sufficient evidence to support this calculation "includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Venture v. UTSW DVA Healthcare, LLP*, No. 16-0006, ___ S.W.3d ___, ___, 2019 WL 1873428,

29

at *20 (Tex. Apr. 26, 2019). Ledbetter explained in his affidavit that he arrived at a reasonable hourly rate for each of the assistant attorneys general assigned to the case by reviewing the average hourly billing rates published in the *Texas Lawyer* for lawyers practicing in Travis County in relevant practice areas, reviewing the billing records kept by each attorney general working on the case, and consulting with each of them regarding the specific services they performed. Based on this review, Ledbetter individually determined each attorney's reasonable hourly rate and the reasonable hours worked on the case and arrived at a reasonable fee. The Department claimed a total of $1,219,975 in fees but suggested an alternate sum of $425,862.50. The alternate sum represented fees the Department incurred responding to Bailey and Peterson's discovery requests and $62,895 for legal services incurred after Bailey's nonsuit. The district court accepted the alternative suggestion and made Bailey and Peterson jointly and severally liable for $362,967.50 and Peterson individually liable for $62,895.

Peterson and Bailey argue generally that the Department's records are insufficient for the district court to determine whether the assistant attorneys general assigned to the case duplicated each other's work. *See El Apple I*, 370 S.W.3d at 762 ("Charges for duplicative, excessive, or inadequately documented work should be excluded."). They assert the Department's records are at least as insufficient as the proof supporting the fee award in *Long v. Griffin*, 442 S.W.3d 253 (Tex. 2014) (per curiam). There, the affidavit supporting the attorney's fees set out the hours worked by each attorney and each attorney's hourly rate, and listed the activities performed during the case. *Id.* at 255. The Texas Supreme Court held this evidence was too general because there was no evidence "to inform the trial court the time spent on specific tasks." *Id. Long* does not control here because

30

Ledbetter reviewed (and submitted with his affidavit) fee records detailing specific amounts of time each assistant attorney general spent on tasks such as "Drafting/Revising Documents," "Reviewing/Research Background Info," "Conferring with AG Personnel," and similar categories. We conclude this evidence is sufficiently specific to enable the district court to make a meaningful evaluation of the reasonableness of the fees claimed for each assistant attorney general on the case. *See State Farm Lloyds v. Hanson*, 500 S.W.3d 84, 99 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (upholding fee award based on time records divided into similar categories).

The Department's request for fees incurred responding to Bailey and Peterson's discovery requests included the fees of contract attorneys the Department hired to review "over 2.75 million documents." Peterson and Bailey contend Ledbetter had insufficient information to determine the contract attorneys' fees were reasonable. Ledbetter submitted with his affidavit time sheets reflecting the name of the contract attorney, the number of hours worked, the date of the work, and that the project was titled "Parks and Wildlife Review." Each time sheet was sent with an invoice (also attached to Ledbetter's affidavit) to Mary Smith, one of the assistant attorneys general assigned to this case, and that billed each contract attorney's time at $30 per hour. We conclude this is sufficient evidence for the district court to make a meaningful evaluation of the reasonableness of the contract attorneys' fees. *See Venture*, 2019 WL 1873428, at \*20.

**Equitable and Just**

A fee award under the UDJA also must be equitable and just. *See* Tex. Civ. Prac. & Rem. Code § 37.009. Trial courts have discretion to "conclude that it is not equitable or just to award even reasonable and necessary fees." *Bocquet*, 972 S.W.2d at 21. The question of whether

31

a fee award is equitable and just "is not susceptible to direct proof but is rather a matter of fairness in light of all the circumstances." *Ridge Oil Co., v. Guinn Invs., Inc.*, 148 S.W.3d 143, 162 (Tex. 2004).

Peterson and Bailey argue the award was not equitable or just because the assistant attorneys general representing the Department supposedly failed to keep sufficiently detailed time records to segregate their fees, the Department's original fee request was excessive, and bringing this lawsuit likely forced the Department to withdraw the emergency rules and replace them with the more reasonable (but still objectionable) permanent CWD Rules. They further argue ordering private citizens to reimburse the Department is unjust given that the Department has substantially more resources available to it. The Department responds awarding some measures of fees was equitable and just in light of Peterson and Bailey's numerous claims, some of which were novel, the millions of documents reviewed in response to their discovery requests, and the consequences to the deer breeding industry if Peterson and Bailey were successful.

Contrary to the assertions made by Peterson and Bailey, the assistant attorneys general working on the case kept sufficiently detailed records to enable Ledbetter to determine individually what portion of the hours each worked on the case was recoverable and to calculate their fees accordingly. Moreover, it is undisputed that Peterson and Bailey raised novel claims and that their discovery requests required the Department to review an unusually large number of documents. Finally, the reasonableness of the Department's original fee request is not before us because the district court awarded less than half of that sum. Even if the district court could have concluded awarding no fees would be equitable and just under these circumstances, it was not compelled to

reach that conclusion here. *See Save Our Springs All.*, 304 S.W.3d at 893 (upholding fee award because "reasonable minds can differ concerning whether the attorney's fees are just and equitable" (quoting *Save Our Springs All., Inc. v. Lazy Nine Mun. Util. Dist. ex rel. Board of Directors*, 198 S.W.3d 300, 318–19 (Tex. App.—Texarkana 2006, pet. denied))). We conclude the district court did not abuse its discretion by making an inequitable or unjust award.

**Peterson's Fee Motion**

As a final matter, Peterson argues the district court abused its discretion by denying his motion for attorney's fees. A court has discretion to award fees to the non-prevailing party. *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637–38 (Tex. 1996). However, a court "is well within its discretion to deny or award attorney's fees based on the outcome of the case." *Brazoria County v. Texas Comm'n on Envtl. Quality*, 128 S.W.3d 728, 744 (Tex. App.—Austin 2004, no pet.). Thus, the district court did not abuse its discretion by overruling Peterson's motion for attorney's fees. *See Ochoa v. Craig*, 262 S.W.3d 29, 33 (Tex. App.—Dallas 2008, pet. denied) (holding no abuse of discretion in denying Ochoa's fee request because she "did not prevail on her declaratory judgment claim").

We overrule Bailey and Peterson's remaining issues.

**CONCLUSION**

We affirm the district court's order.

33

_____

Edward Smith, Justice

Before Justices Goodwin, Baker, and Smith
  Concurring and Dissenting Opinion by Justice Goodwin

Affirmed

Filed:   June 28, 2019